In re the MARRIAGE OF Mary
E. BIGELOW and Robert
D. Bigelow.

Mary E. BIGELOW, Petitioner–
Respondent,

v.

Robert D. BIGELOW, Respondent–
Appellant.

No. 21253.

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 22, 1997.

Motion for Rehearing or Transfer
Denied Jan. 9, 1998.

Application for Transfer Denied
Feb. 24, 1998.

Donald Rhodes, for Petitioner–Respondent.

Michael L. Jackson, Buerkle, Beeson, Ludwig, Wilson & Jackson, L.C., for Respondent.

GARRISON, Presiding Judge.

Robert Bigelow ("Robert") appeals from a decree dissolving his marriage to Mary Bigelow ("Mary")[1]. The sole issue is whether

1. We refer to the parties by their first names solely for the sake of clarity. No disrespect is intended.

the trial court erred in awarding custody of the couple's minor child, Brandon, to Mary. We affirm.

When the parties met in Ohio in 1983, Robert was a forty year old traveling musician, and Mary, age twenty-one, was managing a pet store. They began living together shortly thereafter, and eventually settled in Marble Hill, Missouri. Brandon was born on January 17, 1987. Robert filed suit to establish paternity and determine the custody of Brandon after the parties separated in May or June of 1991. The Bollinger County Circuit Court entered a judgment on August 15, 1991, declaring that Robert was Brandon's natural father, and adopted a stipulation in which the couple agreed that Robert would have primary custody of Brandon, subject to visitation by Mary.

Mary resumed living with Robert in September of 1991, and the couple married on March 30, 1994. The couple separated again on September 15, 1995, and Mary filed a petition for dissolution on September 22, 1995. The trial court dissolved the marriage on September 10, 1996, and awarded primary custody of Brandon to Mary, subject to Robert's rights of reasonable visitation and temporary custody.

 In his sole point on appeal, Robert contends that the trial court's custody award was "arbitrary, capricious, [and] an abuse of discretion." He argues that it is not in Brandon's best interest to be in Mary's custody because she has "exhibited a pattern of deceitfulness, of instability in her relationship with men, of a willingness to relinquish custody of [Brandon] to Robert, and of a desire to be independent of familial obligations."

 This court will affirm the trial court's decree of dissolution unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo.banc 1989); *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We are respectful of the trial court's ability and opportunity to assess the credibility of witnesses, and we recognize that it is entitled to believe or disbelieve all, part, or none of the testimony of any witness. *T.B.G.*, 772 S.W.2d at 654.

 In determining child custody, the trial court must consider all relevant factors, including eight which are statutorily enumerated. § 452.375.2.[2] The trial court has broad discretion to determine what is in the best interests of the child, and we treat that determination with great deference. *In re Marriage of Patroske*, 888 S.W.2d 374, 383 (Mo.App. S.D.1994). It is presumed that the trial court considered all of the evidence, and that its decision on custody is in the child's best interests. *Id.* We will not substitute our judgment for that of the trial court so long as its decision is based on credible evidence. *Id.* at 384. Accordingly, we will not disturb a custody determination unless we are firmly convinced that the child's welfare requires a different disposition. *Breckner v. Coble*, 921 S.W.2d 624, 627 (Mo.App. S.D.1996). On appeal, we view the evidence in the light most favorable to the trial court's decision. *Rogers v. Rogers*, 923 S.W.2d 381, 383 (Mo.App. W.D.1996).

Robert argues that Mary willingly relinquished custody of Brandon and demonstrated a desire to be free of familial obligations. In support, he points to evidence that when she separated from him in 1991, he did not know where she and Brandon were for approximately two weeks, that she lived with Jim Sullins, who also helped hide her vehicle, and that she later agreed in the paternity action that he should have custody of Brandon.

Mary testified, however, that she left Robert because he was physically and verbally abusing her. Included in the verbal abuse she described was his reference to her as a "dumb-ass broad," and a "m——-f—— rotten-ass bitch" in Brandon's presence. Robert admitted that he had called Mary a "slut" on several occasions, and that he had told her she was "dumb." She said that he often slapped her, and had once pushed her down a flight of stairs. Robert denied hitting Mary, but admitted that he had shoved her on one occasion.

---

2. All statutory references are to RSMo 1994.

Mary permitted Robert to take Brandon on a weekend trip after the parties separated in 1991. Robert then refused to return Brandon to her and instituted his action to establish paternity. While Mary stipulated in that proceeding that Robert would have primary custody of Brandon subject to her visitation privileges, she testified that she was not represented by counsel in the paternity suit because she could not afford it, and that she signed the stipulation because she was unemployed at the time and had no way to take care of Brandon. Mary also testified that she returned to Robert in September 1991 because Robert would not let her see Brandon unless she did so.

Robert also contends that Mary's relationships with other men indicate her instability and lack of familial devotion. He testified that she "lived with" Mr. Sullins while the couple was separated in 1991, and that she had had affairs with other men while married to Robert. Robert's investigation of Mary included "staking out" her home, accompanied by Brandon, who referred to the activity as "spying." Mary testified that she did not have an intimate relationship with any other man while she and Robert were married. She stated that her relationship with Mr. Sullins was not romantic, and that while she had dated two other men during the pendency of the dissolution, she did not have intimate relations with either one of them. While she admitted that she had hidden her car at Mr. Sullins' home, she said she did so because Robert had threatened to take the vehicle from her.

Shortly before Mary filed her dissolution petition, Robert decided to move the family to South Carolina. Robert asserts that Mary's lack of enthusiasm for the move, and her conduct in filing for dissolution while Robert was in South Carolina indicate her lack of commitment to the family. Mary testified that she did not really want to move, but that she initially agreed to relocate. She changed her mind when she decided that she no longer wanted to be in the relationship with Robert. She filed the dissolution petition while Robert was on a trip to South Carolina, because, she testified, that was the only time she could have done so and "gotten away without getting hurt."

■ Finally, Robert argues that we should reverse the trial court's custody award because it is contrary to Brandon's own wishes as to his custody. Questioned by the court, Brandon testified that he loves both of his parents, and that he would be happy living with either one of them. While he said that he would rather live in South Carolina, he indicated that he did not want to have to choose between his parents. The child's wish as to his custodian is one of the factors the trial court must consider when making a custody determination. § 452.375.2(2). However, the trial court is required to consider *all* relevant factors; the child's preference, while important, is not dispositive. § 452.375.2; *Breckner,* 921 S.W.2d at 627.

The trial court found that it was in Brandon's best interests for Mary to have primary custody of him. Robert has not persuaded us otherwise. While his account of his own and Mary's behavior during their relationship differs markedly from Mary's version, the trial court was not obliged to believe his testimony, or to accept his interpretation of the events. *T.B.G.,* 772 S.W.2d at 654. Likewise, the court was not required to conclude from the evidence that the best interests of Brandon required that his custody be awarded to Robert. The custody award is neither unsupported by substantial evidence, nor against the weight of the evidence. *Id.* It is also not an abuse of discretion. *Patroske,* 888 S.W.2d at 383.

The judgment of the trial court is affirmed.

PREWITT and CROW, JJ., concur.